IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

METROPOLITAN PROPERTY
AND CASUALTY INSURANCE     :
CO., a/s/o NORMAN
HENDRICKS, *et al.*,     :

        Plaintiffs,            Case No. 3:14-cv-143

      v.              :     JUDGE WALTER H. RICE

PEST DOCTOR SYSTEMS, INC.,
d/b/a A-1 ABLE PEST
DOCTORS,

        Defendant.

---

DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (DOC. #60); JUDGMENT TO ENTER IN
FAVOR OF DEFENDANT AND AGAINST PLAINTIFFS; TERMINATION
ENTRY

---

Plaintiff Metropolitan Property and Casualty Insurance Co. ("Metropolitan"),

as subrogee of its insured, Norman Hendricks, filed suit against Pest Doctor

Systems, Inc., d/b/a A-1 Able Pest Doctors ("Pest Doctors"), after a stovetop fire

damaged Mr. Hendricks' home while Defendant's employees were performing pest

control services there. The Court's jurisdiction is based on 28 U.S.C. § 1332.[1]

---

[1] Diversity of citizenship between parties depends on the citizenship of the
subrogee (Metropolitan)—not the subrogor (Norman Hendricks). *See Cont'l Cas.
Co. v. Ohio Edison Co.*, 126 F.2d 423, 425-26 (6th Cir. 1942). Here,
Metropolitan is incorporated in Rhode Island and has its principal place of business
there, as well. Doc. #31, PageID#204. Pest Doctors is incorporated in Indiana
and has its principal place of business in Ohio. *Id.* at PageID#205.

This matter is currently before the Court on Defendant's Motion for Summary Judgment. Doc. #60.

## I.      BACKGROUND AND PROCEDURAL HISTORY

Norman Hendricks and his adult son, Terry Hendricks, live together in West Carrollton, Ohio. Doc. #61-1, PageID##724-25. After discovering bed bugs in their home, Terry Hendricks called Pest Doctors for extermination services. *Id.* at PageID#799. A Pest Doctors employee inspected the Hendrickses' house, confirmed the presence of bed bugs, and scheduled an extermination appointment for the following week. Doc. #59-6, PageID##442-43. The employee explained that the treatment involved raising the ambient temperature inside the house to 135 degrees Fahrenheit using portable heaters, *see* Doc. #62-1, PageID##839-40, and advised the Hendrickses to move items susceptible to heat damage into the basement, which would not be heated, Doc. #59-6, PageID##439-40.

Two Pest Doctors technicians arrived at the Hendrickses' house around 9:00 a.m. on January 11, 2013, to perform the bed bug treatment. Doc. #67-1, PageID#1247. Before work began, Norman Hendricks signed a Service Contract (Doc. #14-1) and paid $1,250 plus tax for the treatment. Doc. #60-2, PageID##703-04; Doc. #67-1, PageID#1247. The Service Contract provided, in part, that Pest Doctors would not be liable for property damage unless caused by its own gross negligence. Doc. #14-2, PageID#61.

Next, the technicians told Norman Hendricks that he and his son could not stay in the house during the heat treatment. Doc. #61-1, PageID#735. While the Hendrickses were preparing to leave, the technicians wheeled in several portable heaters, centering one unit in between the electric stove and the sink of the home's galley-style kitchen. *See* Doc. #67-1, PageID#1252. Terry Hendricks, who spent the previous evening moving items from the kitchen cupboards into the basement, had left various sundries[2] on top of the metal covers that decorated the stove's burners. *Id.* at PageID#1261. After one of the technicians assured them that the heat would not damage the stovetop items, the Hendrickses left for the day with instructions to return at 6:00 p.m. Doc. #59-6, PageID##440-41.

The Pest Doctors technicians turned on the heaters, set up fans, rotated furniture, and moved clutter in the house to ensure even heat distribution. Doc. #67-1, PageID##1249-50. Throughout this process, the employees took short breaks to cool off in their truck and in unheated areas of the house such as the basement and the garage. Doc. #64-2, PageID##1055-59. The basement and garage entrances are located in the rear of the kitchen and can be accessed either through the living room entrance to the kitchen, which requires passing the kitchen stove, or through the TV room entrance, which does not. Doc. #59-7, PageID#485; Doc. #62-1, PageID##888-89. Both technicians allege they used the TV room route exclusively because the heater they had placed in front of the stove

---

[2] *See* Doc. #59-4, PageID#409 (a banana holder); Doc. #59-6, PageID#440 (a pack of water filters); Doc. #60-1, PageID#698 (a plastic container of mop sheets); Doc. #61-1, PageID##794-95 (a box of baking soda and paper towels).

earlier that morning obstructed the living room route. Doc. #62-1, PageID#888; Doc. #64-2, PageID##1056-57, 1074-75, 1086.

The technicians went into the basement to take a break at approximately 2:00 p.m. and heard a smoke detector about five minutes later. Doc. #62-1, PageID##887-88. They exited the basement, saw the stovetop aflame, left the house, and called 911. *Id.* at PageID#893. The fire department arrived shortly thereafter. *Id.* at PageID#895. After extinguishing the fire, a firefighter noticed that one of the stove's burners was on. Doc. #64-1, PageID#958. He turned it off using the controls in front of the stove. *Id.* The stove's controls were knobs that did not have to be pushed in to turn. Doc. #61-1, PageID#811. The firefighter does not recall the burner's temperature setting before he switched it off. Doc. #64-1, PageID#962.

A member of the fire department investigated the scene and determined that the fire started because the stove's right front burner was on and had ignited combustible items sitting on top of the burner's metal cover. Doc. #59-7, PageID#520. However, the fire department investigator was unable to determine how long the burner had been on prior to the fire. Doc. #67-1, PageID#1257.

Norman Hendricks returned home and discovered the fire damage at 6:00 p.m. Doc. #61-1, PageID#806. Later, he filed a claim with Metropolitan, his homeowners' insurance company. On January 15, 2013, Metropolitan's own investigator confirmed that the fire started on the stovetop. *See* Doc. #60-1, PageID##696, 698. Given the timing of the fire, the investigator deduced that a

4

Pest Doctors technician must have somehow bumped into the control knobs on the front of the stove, inadvertently turning it on. Doc. #59-8, PageID#549. Metropolitan's investigator did not tag anything to be preserved as relevant evidence while he was at the Hendrickses' house and nobody from Metropolitan secured or preserved the physical evidence from the fire. Doc. #67-1, PageID##1284-85, 1298.

As part of the claims adjustment process, Metropolitan also hired two cleaning companies and a restoration company. *Id.* at PageID#1268. One of these companies disposed of the stove and other evidence from the fire at some point after the investigation but before the filing of the present action. *See id.* at PageID##1268-69; *see also* Doc. #61-1, PageID#749 ("[T]hree women . . . cleaned everything out that was burnable, plastic, wood, everything. They cleared it all out."). Pest Doctors did not have the opportunity to inspect the evidence before it was destroyed. Doc. #67-1, PageID#1292.

Metropolitan paid Norman Hendricks' claim, incurring approximately $96,368.62 in expenses from the fire. Doc. #31, PageID#208. It then filed suit against Pest Doctors, asserting its subrogation rights. Doc. #1. In its Amended Complaint, Metropolitan alleges breach of contract, negligence, and gross negligence. Doc. #31, PageID##206-08. It asserts that, given the timing and origin of the fire, Pest Doctors must have started the fire by hitting—and thus activating—the stove's knob. On May 19, 2015, Pest Doctors filed a Motion for Summary Judgment. Doc. #60.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment must be entered "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp.

v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial

responsibility of informing the court of the basis for its motion, and identifying

those portions of the record which it believes demonstrate the absence of a

genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d

1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must

present evidence that creates a genuine issue of material fact making it necessary

to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241,

1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

250 (1986). Once the burden of production has so shifted, the party opposing

summary judgment cannot rest on its pleadings or merely reassert its previous

allegations. It is not sufficient to "simply show that there is some metaphysical

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond

the [unverified] pleadings" and present some type of evidentiary material in support

of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a

scintilla of evidence in support of his position; the evidence must be such that a

jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe; credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2726 (3d ed. 1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). If it so chooses, however, a court may consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

### III.     ANALYSIS

Pest Doctors contends it is entitled to summary judgment because (A) Metropolitan has produced insufficient evidence that Pest Doctors acted with the gross negligence necessary to establish a breach of contract claim; (B) Metropolitan has produced insufficient evidence to establish a separate gross negligence claim; (C) Pest Doctors' Service Contract bars Metropolitan's negligence claim as a matter of law, as Pest Doctors owed no duty of care to Norman Hendricks independent of the Service Contract; and (D) dismissal is the appropriate sanction for Metropolitan's negligent spoliation of evidence. Alternatively, Pest Doctors contends that its Service Contract limits damages to $1,250 as a matter of law.

#### A.     Breach of Contract (Count I)

The first issue is whether Metropolitan has produced sufficient evidence from which a jury could reasonably find that Pest Doctors breached its contract with Norman Hendricks.  Metropolitan alleges that Pest Doctors breached the Service Contract: (1) by failing to perform its bargained-for services; (2) by failing to exercise reasonable care; and (3) through actions constituting gross negligence. Pest Doctors asserts that only the gross negligence allegation could constitute a breach of the Service Contract's terms.  Regarding this alleged breach, Pest Doctors contends that Metropolitan has failed to produce sufficient evidence for a jury to reasonably find that Pest Doctors was grossly negligent.

8

Federal courts apply the forum state's substantive law in diversity actions. *Savedoff v. Access Grp., Inc.,* 524 F.3d 754, 762 (6th Cir. 2008) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)). Here, neither party disputes that Ohio law governs Metropolitan's claims. "Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012) (citing *Savedoff,* 524 F.3d at 762). A defendant breaches a contract if it "fails to perform according to the terms of the contract or acts in a manner that is contrary to its provisions." *Savedoff*, 524 F.3d at 762. Here, both parties agree that Norman Hendricks entered into a contract with Pest Doctors and paid for the treatment. *See* Doc. #67-1, PageID#1247. Additionally, Metropolitan has established that fire and smoke damaged the Hendrickses' house. *See, e.g.*, Doc. #66-1 (pictures of damage); Doc. #70-2 (restoration company's loss report). However, Metropolitan must still prove a breach by Pest Doctors that caused the damage.

### 1. Breach for Failing to Perform Bargained-for Services

Norman Hendricks and Pest Doctors entered into a contract "for the treatment of bed bugs." *See* Doc. #14-1. Metropolitan has neither alleged nor produced evidence that Pest Doctors did not eradicate the Hendrickses' bed bug infestation. Instead, Metropolitan contends that Pest Doctors failed to adequately perform its services because the Pest Doctors technicians left after the fire and did

9

not stay for the entire timeframe allocated to treat the house (9:00 a.m. to 6:00 p.m.). However, the contract does not specify the timeframe as a term. Even if it did, the breach needs to have caused the damage to the plaintiff to be actionable. *See V & M Star Steel*, 678 F.3d at 465. The Pest Doctors' technicians did not cause the fire and smoke damage by leaving early, so Metropolitan cannot establish a breach of contract claim on this fact alone.

Metropolitan also alleges that the bargained-for services included "safe and property[-]damage-free bed bug remediation services." Doc. #31, PageID#207. Paragraph F of the Service Contract provides, in relevant part:

> Limits of Liability: Although [Pest Doctors] will exercise reasonable care in performing services under this Contract, [Pest Doctors] will not be liable for injuries or damage to persons, property, birds, animals or vegetation, except those damages resulting from gross negligence by [Pest Doctors]. Further, under no circumstances will [Pest Doctors] be responsible for any injury, disease or illness caused, or allegedly caused, by bites, stings or contamination of bed bugs or any other insects, spiders, rodents, or beetles. . . . To the fullest extent permitted by law, [Pest Doctors] will not be liable for personal injury, death, property damage, loss of use, loss of income or any other damages whatsoever, including consequential and incidental damages, arising from this service. [Pest Doctors'] liability is specifically limited to the labor and products necessary to help reduce bed bug populations.

Doc. #14-2, PageID#61. The plain language of the contract reveals that Pest Doctors covenanted only not to damage property through gross negligence. To the extent that Metropolitan alleges that Pest Doctors failed to perform its bargained-for services by damaging property through actions other than those constituting gross negligence, Pest Doctors is entitled to summary judgment as a matter of law.

## 2. Breach for Failing to Exercise Reasonable Care

Metropolitan further alleges that Pest Doctors breached its Service Contract by failing to exercise reasonable care in performing its duties.  The Service Contract provides:  "Although [Pest Doctors] will exercise reasonable care in performing services under this Contract, [Pest Doctors] will not be liable for injuries or damage . . . except those damages resulting from gross negligence by [Pest Doctors]."  Doc. #14-2, PageID#61.  While this provision does contain the words "will exercise reasonable care in performing its duties," the subordinating conjunction "although" indicates they are part of the subordinate clause of the sentence.  The main clause of the sentence explicitly disclaims liability for damages not caused by gross negligence.  This means that, absent gross negligence, damages from Pest Doctors' alleged failure to exercise reasonable care cannot form the basis of a breach of contract claim.

While Pest Doctors is entitled to summary judgment on Metropolitan's claim that Pest Doctors breached the Service Contract by failing to exercise reasonable care in performing its duties, this does not mean that Metropolitan cannot allege negligence in a separate tort claim.[3]

## 3. Breach Through Actions Constituting Gross Negligence

Pest Doctors concedes that it owed Norman Hendricks a contractual duty not to cause property damage through gross negligence.  *See* Doc. #60, PageID#622.  Gross negligence is the failure to exercise any care, slight care, or

---

[3] *See infra* Part III C.

the amount of care that even a careless person would use. *Thompson Elec., Inc. v. Bank One, Akron, N.A.*, 37 Ohio St. 3d 259, 265, 525 N.E.2d 761, 768 (1988). A plaintiff alleging gross negligence must show willful and wanton misconduct. *Vidovic v. Hoynes*, 2015-Ohio-712, 29 N.E.3d 338, 348, ¶ 51 (Ct. App.). Willful misconduct is "an intentional deviation from a clear duty . . . with knowledge or appreciation of the likelihood of resulting injury," and wanton misconduct "is the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson v. Massillon*, 134 Ohio St. 3d 380, 388, 2012-Ohio-5711, 983 N.E.2d 266, 273, ¶¶ 32-33 (citations omitted); *see, e.g.*, *Hawkins v. Ivy*, 50 Ohio St. 2d 114, 116, 363 N.E.2d 367, 368 (1977) (finding wanton misconduct where a motorist, with full knowledge of the circumstances, failed to take any precaution in leaving his disabled vehicle in a highway lane on a snowy night).

Whether a defendant's actions amount to willful or wanton misconduct is normally a jury question. *Phillips v. Dayton Power & Light Co.*, 93 Ohio App. 3d 111, 119, 637 N.E.2d 963, 968 (1994). To survive summary judgment, though, a plaintiff must present sufficient evidence such that jury could reasonably find in its favor. *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994). Metropolitan has not presented any evidence to support a finding that Pest Doctors either (1) intentionally deviated from a duty of care with knowledge that injury would likely result; or (2) failed to exercise any care under circumstances in which there was a great probability that harm would result.

Norman Hendricks testified that he and Terry likely would have noticed if the stove burner was on before they left the house that morning. Doc. #61-1, PageID##763, 809-10, 816. Terry testified that the burner was not on the previous day when he was working in the kitchen. Doc. #59-6, PageID##474-76. Nevertheless, Norman and Terry Hendricks, the Metropolitan insurance adjuster, the fire department investigator, and one of the firemen all admitted in their depositions that they have no evidence that the burner was activated by Pest Doctors' technicians, either intentionally or accidentally. *See* Doc. #59-3, PageID#345; Doc. #59-4, PageID##402-03; Doc. #59-6, PageID#452; Doc. #59-9, PageID#590.

Likewise, Nathan Bromen, the expert witness hired by Metropolitan, admitted that he had no physical evidence that the technicians turned the stove on. Doc. #59-8, PageID#549. Rather, he deduced that they must have been responsible, based solely on the timing of the fire. He concluded that if the burner had been activated before 9:00 a.m., it would have been discovered well before 2:00 p.m. *Id.*

Metropolitan contends that, because the stove was in the exclusive control of Pest Doctors' employees for five hours before the fire started, the doctrine of res ipsa loquitur should permit a jury to draw an inference of gross negligence.[4]

---

[4] The doctrine of res ipsa loquitur is an evidentiary rule that permits a jury to draw an inference of negligence from circumstantial evidence when: (1) the instrumentality causing the injury was under the exclusive management and control of the defendant; and (2) the injury occurred under circumstances such that it

13

However, while a plaintiff may use the evidentiary rule of res ipsa loquitur to overcome its burden of production in establishing *ordinary* negligence, the doctrine is not available where the requisite standard of conduct is *gross* negligence. This is because gross negligence requires a showing of a *conscious* disregard of a known risk. *See* Restatement (Second) of Torts § 328D cmt. j (1965); W. Page Keeton et al., *Prosser & Keeton on the Law of Torts* § 39 (5th ed. 1984); 23 A.L.R.3d 1083 § 2 (1969) ("the doctrine of res ipsa loquitur is not applicable where it is necessary to show that defendant was guilty of active or gross negligence, wil[l]ful misconduct, recklessness, or the like."); *see also* Note, *Res Ipsa Loquitur and Gross Negligence*, 1959 Duke L.J. 306, 306 (1959) (noting the "apparently unanimous rule" that the doctrine of res ipsa loquitur cannot create an inference of gross negligence).

Metropolitan would bear the burden of proving breach of contract at trial. *See Savedoff*, 524 F.3d at 762. Accordingly, Pest Doctors is entitled to judgment as a matter of law if Metropolitan fails to produce sufficient evidence for a jury to reasonably find that Pest Doctors breached the Service Contract. *See Celotex*, 477 U.S. at 322-23. Metropolitan has not produced sufficient evidence of gross negligence to create a genuine issue of disputed fact, and cannot rely on the doctrine of res ipsa loquitur to overcome this insufficient showing. Pest Doctors is therefore entitled to summary judgment on Metropolitan's claim that Pest Doctors breached its Service Contract through actions constituting gross negligence.

---

would not have occurred had ordinary care been observed. *Hake v. George Wiedemann Brewing Co.*, 23 Ohio St. 2d 65, 66-67, 262 N.E.2d 703, 705 (1970).

For the foregoing reasons, the Court SUSTAINS Pest Doctors' Motion for Summary Judgment on Metropolitan's breach of contract claims.

### B.    Gross Negligence (Count III)

In its Amended Complaint, Metropolitan asserts a common law gross negligence claim against Pest Doctors.  For the same reasons articulated above in Part III.A.3, Pest Doctors is also entitled to judgment as a matter of law on Metropolitan's separate gross negligence claim.  The Court therefore SUSTAINS this portion of Pest Doctors' Motion for Summary Judgment.

### C.    Negligence (Count II)

The third issue is whether the service contract bars Metropolitan's common law negligence claim as a matter of law.  To establish a cause of action for negligence in Ohio, a plaintiff must show "the existence of a duty, a breach of that duty and injury resulting proximately therefrom." *Mussivand v. David*, 45 Ohio St. 3d 314, 318, 544 N.E.2d 265, 270 (1989).  The existence of a duty is a question of law.  *Id.*  Metropolitan contends that, independent of its contractual duties, Pest Doctors breached a common law duty of care by negligently starting a fire in the Hendrickses' house.  Pest Doctors counters that it owed no duties outside its Service Contract, which explicitly disclaims liability for everything except gross negligence.

Even if a duty existed, and even if a jury could reasonably find that Pest Doctors breached its duty and proximately caused injury, Pest Doctors contracted to limit its liability for property damage not caused by gross negligence. *See* Doc.

#14-2, PageID#61.  The existence of an independent duty to exercise ordinary care does not preclude a party from limiting its liability through contract.  *See Nahra v. Honeywell, Inc.*, 892 F. Supp. 962, 973 (N.D. Ohio 1995) ("Assuming *arguendo* that the law *did* impose an independent duty on [the defendant,] . . . [the defendant] expressly limited its liability for the negligent breach of that duty in . . . the contract . . . .").  The issue, then, is whether this provision is enforceable and therefore entitles Pest Doctors to judgment as a matter of law.

First, it is worth noting that Paragraph F of the Service Contract[5] contains exculpatory clauses in addition to a limitation-of-liability clause.  The first three sentences of Paragraph F disclaim, respectively: (1) liability for injuries or damages except those caused by gross negligence; (2) all liability for injuries or damages caused by pests; and (3) "[t]o the fullest extent permitted by law," liability for injuries and damages, including consequential and incidental damages, arising from the service.  *See* Doc. #14-2, PageID#61.  These provisions are exculpatory because they completely relieve Pest Doctors of certain liabilities.  *See Black's Law Dictionary* 687-88 (10th ed. 2014) (defining "exculpatory clause" as a "contractual provision relieving a party from liability resulting from a negligent or wrongful act").

The last sentence of Paragraph F, however, provides that liability is "specifically limited" to the cost of the service.  Doc. #14-2, PageID#61.  This is a limitation-of-liability clause because it restricts, rather than eliminates, the amount of compensation available.  *See Nahra*, 892 F. Supp. at 969.  The presence of

---

[5] See Part III A.1 for the relevant text.

exculpatory and limitation-of-liability provisions within the same paragraph raises the question of whether Pest Doctors contracted for "no liability" or for a specific dollar amount of liability.

Seemingly contradictory provisions such as these should be construed in their context, paying particular attention to the predominant, structural focus of the section. *See Nahra*, 892 F. Supp. at 967. Taken as a whole, Paragraph F's predominant focus is to disclaim all liability for injuries or damage, except for damages caused by gross negligence. The last sentence is merely a catch-all provision included to limit Pest Doctors' liability for unarticulated scenarios. *See Royal Indem. Co. v. Baker Protective Servs., Inc.*, 33 Ohio App. 3d 184, 186, 515 N.E.2d 5, 7 (1986) (opining on the "belt and suspenders" approach to legal draftsmanship). Consequently, the exculpatory clause of Paragraph F controls the present action. Its enforceability depends on Ohio law governing exculpatory provisions.[6]

Exculpatory clauses may be freely bargained for in Ohio. *Nahra*, 892 F. Supp. at 969 (citing *Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.,* 54 Ohio St. 2d 147, 375 N.E.2d 410 (1978)). "[A]bsent important public policy concerns, unconscionability, or vague and ambiguous terms, limiting or exculpatory provisions will be upheld." *Collins v. Click Camera & Video, Inc.*, 86 Ohio App. 3d 826, 832, 621 N.E.2d 1294, 1298 (1993). Even though contracts purporting to

---

[6] See *Braden v. Honeywell, Inc.*, 8 F. Supp. 2d 724 (S.D. Ohio 1998) and *Nahra v. Honeywell, Inc.*, 892 F. Supp. 962 (N.D. Ohio 1995) for discussions of the distinctions between Ohio law governing liquidated damages provisions, limitation-of-liability clauses, and exculpatory clauses.

relieve one from negligence must be strictly construed, "it is not necessary to use the word 'negligence' if the intent of the parties is expressed in clear and unequivocal terms." *Hine v. Dayton Speedway Corp.*, 20 Ohio App. 2d 185, 189, 252 N.E.2d 648, 651 (1969). By providing that Pest Doctors will not be liable for injuries or damages except those resulting from *gross* negligence, the Service Contract unambiguously disclaims liability for *ordinary* negligence. As its terms are not vague or ambiguous, the exculpatory provision should be upheld unless it is void as a matter of public policy or unconscionable.

### 1. Public Policy

In determining whether an exculpatory provision is void as a matter of public policy, courts consider the necessity of the goods or services, whether their provision serves a quasi-public function, whether the supplier is a monopolist, and whether the customer is in a position to assent to the provision. *Collins*, 86 Ohio App. 3d at 832, 621 N.E.2d at 1298. It is uncertain whether pest control services are a necessity. However, they are not the type of services typically found to serve quasi-public functions. *See, e.g.*, *Berjian*, 54 Ohio St. 2d at 154-56, 375 N.E.2d at 415-16 (ruling that a telephone company's phone service served a public function but its classified advertising service did not because the company had no legal or public duty to provide the latter); *Orlett v. Suburban Propane*, 54 Ohio App. 3d 127, 129, 561 N.E.2d 1066, 1069 (1989) (finding that a supplier of liquid propane serves a quasi-public function similar to that of a public utility). Additionally, the Court takes judicial notice, pursuant to Fed. R. Evid. 201, that

Pest Doctors does not have a monopoly on the provision of pest control services in the West Carrollton area.  Therefore, whether the Service Contract's exculpatory provision is void as a matter of public policy depends on whether a customer is in a position to assent to its terms.

Norman Hendricks signed the Service Contract before the Pest Doctors' technicians began treating his house.  Doc. #67-1, PageID#1247.  This is not a situation akin to customers entering a parking lot and receiving terms on tickets only after they surrender their car.  *See Collins*, 86 Ohio App. 3d at 833, 621 N.E.2d at 1298 (describing the inability to assent in "parking lot" cases).  Had Norman Hendricks not felt comfortable with the exculpatory provision, he could have declined Pest Doctors' services and sought out a pest control company with more favorable terms.  For these reasons, the Court finds that the Service Contract's exculpatory provision is not void as a matter of public policy.

### 2. Unconscionability

"Unconscionability is generally recognized to include an absence of meaningful choice on the part of one of the parties to a contract, combined with contract terms that are unreasonably favorable to the other party."  *Id.* at 834, 621 N.E.2d at 1299.  These two requirements are known as "procedural" and "substantive" unconscionability, respectively.  *See id.*  The party alleging unconscionability bears the burden of proving a quantum of both procedural *and* substantive unconscionability.  *Hayes v. Oakridge Home*, 122 Ohio St. 3d 63, 67, 2009-Ohio-2054, 908 N.E.2d 408, 412, ¶ 20.  The unconscionability of a contract

provision is a question of law. *Ins. Co. of N. Am. v. Automatic Sprinkler Corp. of Am.*, 67 Ohio St. 2d 91, 98, 423 N.E.2d 151, 156 (1981).

### a. *Procedural Unconscionability*

Assessing procedural unconscionability, or "bargaining naughtiness," requires an analysis of the contracting parties' relative bargaining positions, which may depend on factors such as "age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, [and] whether there were alternative sources of supply for the goods in question." *Collins*, 86 Ohio App. 3d at 834, 621 N.E.2d at 1299 (quoting *Johnson v. Mobil Oil Corp.*, 415 F. Supp. 264, 268 (E.D. Mich. 1976)). Additionally, the stronger party's knowledge that the weaker party is unable to reasonably protect its interests "by reason of physical or mental infirmities, ignorance, illiteracy or inability to understand the language of the agreement, or similar factors" may contribute to a finding of procedural unconscionability. *Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St. 3d 352, 362, 2008-Ohio-938, 884 N.E.2d 12, 22-23, ¶ 44 (quoting Restatement (Second) of Contracts § 208 cmt. d (1981)).

Here, the factors enumerated above do not favor a finding of procedural unconscionability. Norman Hendricks is healthy, has not been diagnosed with any medical conditions over the last five years, and still drives. Doc. #67-1, PageID#1267. Though his level of education is not mentioned in the record, it is

apparent that Norman Hendricks is not mentally infirm, ignorant, or illiterate. He served in the Army, Doc. #61-1, PageID##728-29, worked for the NCR Corporation in assembly and time study positions, *id.* at PageID#778, and continues to read the newspaper every day, *id.* at PageID#741. These factors weigh against a finding of procedural unconscionability. *See Pruitt v. Strong Style Fitness*, 2011-Ohio-5272, ¶ 17 (Ct. App.) (declining to find unequal bargaining power where the plaintiff served in the military, attended college, and was employed).

In support of its argument that the exculpatory provision is unconscionable, Metropolitan notes that Norman Hendricks is 100 years old, and that he did not read the entire contract. Doc. #67, PageID#1243. However, a contract is not procedurally unconscionable solely by virtue of a person's age, *Hayes*, 122 Ohio St. 3d at 69, 2009-Ohio-2054, 908 N.E.2d at 414, at ¶ 31, and the "failure to read a contract does not make the contract procedurally unreasonable," *Eastham v. Chesapeake Appalachia, L.L.C.*, 754 F.3d 356, 366 (6th Cir. 2014). Moreover, immediately preceding the Service Contract's signature line is a paragraph in underlined text providing that the signatory has read and accepted the Contract's terms and conditions. Doc. #14-2, PageID#60. Such provisions typically weigh against a finding of procedural unconscionability. *See, e.g.*, *Pruitt*, 2011-Ohio-5272, at ¶ 18; *Wallace v. Ganley Auto Grp.*, 2011-Ohio-2909, ¶ 32 (Ct. App.). Furthermore, there is no evidence that Pest Doctors believed that Norman Hendricks was unable to protect his interests in any way, so the case at bar does

not exemplify the "bargaining naughtiness" that occurs when one party purposely exploits an unequal bargaining position.

It is uncertain whether or not Norman Hendricks could have made alterations to the contract had he wished to do so. By itself, though, the inability to alter a contract's terms is insufficient to establish procedural unconscionability. *Collins*, 86 Ohio App. 3d at 835, 621 N.E.2d at 1300. Ohio courts have declined to find so-called "adhesion contracts" procedurally unconscionable where alternative sources exist for nonessential goods or services. *Compare Pruitt*, 2011-Ohio-5272, at ¶ 18 (ruling that an exculpatory clause was not unconscionable where the plaintiff was free to walk away from a contract to join a fitness center), *and Collins*, 86 Ohio App. 3d at 836, 621 N.E.2d at 1300 (upholding a film processing contract's exculpatory provision because the plaintiff could have taken his film elsewhere had he found the provision unacceptable), *with Orlett*, 54 Ohio App. 3d at 129, 561 N.E.2d at 1069 (finding an exculpatory clause unconscionable where the plaintiffs had to agree to a gas supplier's terms to receive propane for their basic living needs). As Norman Hendricks was free to decline Pest Doctors' terms and find an alternative pest control service, his inability to alter the Service Contract does not make it procedurally unconscionable.

Together, Norman Hendricks' competency and his ability to reject the Service Contract if he disagreed with the exculpatory provision weigh against a finding of procedural unconscionability.

22

### b. *Substantive Unconscionability*

Even if Metropolitan could establish a quantum of procedural unconscionability, it must also prove that the Service Contract's exculpatory provision is substantively unconscionable. *See Hayes*, 122 Ohio St. 3d at 69, 2009-Ohio-2054, 908 N.E.2d at 414, at ¶ 30; *see also Pruitt*, 2011-Ohio-5272, at ¶ 16 ("Simply relying on the unequal bargaining position of the parties, part of the procedural unconscionability analysis, is insufficient."). Assessing substantive unconscionability involves determining the commercial reasonableness of the contract terms. *Hayes*, 122 Ohio St. 3d at 69, 2009-Ohio-2054, 908 N.E.2d at 414, at ¶ 33. While there are no bright-line criteria for determining commercial reasonableness, commonly considered factors include "the fairness of the terms, the charge for the service rendered, the standard in the industry, and the ability to accurately predict the extent of future liability." *Id.* (quoting *Collins*, 86 Ohio App. 3d at 834, 621 N.E.2d at 1299).

Metropolitan contends that the exculpatory provision is unfair because the expenses from the fire, which amount to $96,368.62, are more than 77 times greater than the contract price, $1,250. Doc. #67, PageID#1243. However, a large disparity between the charge for a service and the potential liability for negligence actually *favors* a finding that limiting liability is commercially reasonable. *See Collins*, 86 Ohio App. 3d at 834, 621 N.E.2d at 1299 (finding a limitation-of-liability provision commercially reasonable where damages from alleged negligence were more than 100 times greater than the contract price). This is because,

without the ability to limit liability, the contract price would have to increase to cover the exposure for damages. *Id.* at 835, 621 N.E.2d at 1299-1300.

Here, Pest Doctors' business model exposes the company to an unpredictable range of potential liability. Indeed, Metropolitan correctly notes that the damages could have been much greater if the Hendrickses lived in a larger residence. *See* Doc. #67, PageID#1243. Without an exculpatory clause, Pest Doctors would have to conduct individualized appraisals of homes to determine an appropriate contract price to cover its exposure or, alternatively, to charge all of its customers a higher price. Considering the burden this would create, individual homeowners are in a better position than Pest Doctors to purchase the appropriate amount of insurance. Moreover, the Service Contract exempts Pest Doctors only from ordinary—not gross—negligence, which further supports the provision's commercial reasonableness. *See Berjian*, 54 Ohio St. 2d at 158, 375 N.E.2d at 417 (holding that, absent a showing of willful or wanton misconduct, a company was entitled to contractually limit its liability for negligence). As the terms of the Service Contract are fair and Pest Doctors would otherwise be exposed to unpredictable liability far greater than its contract price, Metropolitan has not established that the exculpatory provision is substantively unconscionable.

The Service Contract's exculpatory provision is valid and enforceable, because its terms are not vague, ambiguous, void as a matter of public policy, or unconscionable. Accordingly, Pest Doctors is not liable for damages arising from ordinary negligence and is entitled to judgment as a matter of law on

Metropolitan's negligence claim.  The Court therefore SUSTAINS this portion of Pest Doctors' Motion for Summary Judgment.

### D.    Spoliation of Evidence

Pest Doctors also contends that it is entitled to summary judgment as a sanction for Metropolitan's negligent spoliation of evidence.  Spoliation is the "destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction."  *United States v. Copeland*, 321 F.3d 582, 597 (6th Cir. 2003).  Pest Doctors did not have the opportunity to physically inspect the stove and other relevant evidence before it was destroyed.  Doc. #67-1, PageID#1292.  As a result, Pest Doctors asserts that it is entirely defenseless to disprove Metropolitan's negligence theory.  Given that the Court has concluded that Pest Doctors is entitled to summary judgment on all of Metropolitan's claims,[7] it need not address the question of whether dismissal is appropriate as a sanction for the alleged negligent spoliation of evidence.[8]

### E.    Limitation of Liability

In the alternative, Pest Doctors contends that its liability "is specifically limited to the labor and products necessary to help reduce bed bug populations,"

---

[7] *See supra* Part III A-C.

[8] The Court notes, however, that a spoliation sanction's severity should correspond to the offending party's degree of fault, which ranges "from innocence through the degrees of negligence to intentionality."  *Beaven v. U.S. Dep't of Justice*, 622 F.3d 540, 554 (6th Cir. 2010) (quoting *Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009)).  Dismissal is "the most severe sanction possible."  *Byrd v. Alpha Alliance Ins. Corp.*, 518 F. App'x 380, 385 (6th Cir. 2013).  Accordingly, it "should rarely be imposed and only when significant prejudice results from the evidence's destruction."  *Id.* at 386.

which amounts to $1,250.  Doc. #60, PageID#636.  In response, Metropolitan

argues that limiting liability to such an amount would be unconscionable.  Because

Pest Doctors is entitled to summary judgment on all of Metropolitan's claims,[9] the

Court need not decide whether limiting Pest Doctors' liability to the value of the

bed bug treatment ($1,250) would be unconscionable.


## IV.   CONCLUSION

In its Amended Complaint, Metropolitan alleges breach of contract (Count I),

negligence (Count II), and gross negligence (Count III).  The Court SUSTAINS

Defendant Pest Doctors' Motion for Summary Judgment, Doc. #60, on all three

counts.  Judgment shall be entered in favor of the Defendant and against the

Plaintiff.


The captioned case is hereby ordered terminated upon the docket records of

the United States District Court for the Southern District of Ohio, Western Division,

at Dayton.


Date:  August 20, 2015         _____

WALTER H. RICE
UNITED STATES DISTRICT JUDGE

---

[9] *See supra* Part III A-C.